# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JANE ROE,               )

                     )

      **Plaintiff,**      )

                     )

    **vs.**               )     **Case No. 4:12cv0781 TCM**

                     )

**WASHINGTON COUNTY, MO., and**    )

**PEACE OFFICER JOHN DOE,**     )

                     )

      **Defendants.**    )

## MEMORANDUM AND ORDER

Pending in this case is the motion filed by Washington County, Missouri (Washington County), for summary judgment on the three counts against it in the six-count complaint filed by Jane Roe (Plaintiff).[1]

## Background

Plaintiff was a pretrial detainee confined in the Washington County Jail (the Jail) between April 13, 2010, and June 23, 2010. (Def.'s[2] Stat.[3] ¶ 1, ECF No. 41-1; Def.'s Ex. B, ECF No. 41-3.) At times during her confinement, she was housed by herself in a large holding cell, referred to as the "LHT." (Pl.'s Add'l Stat. ¶ 6, ECF No. 46-1.) The LHT is across from the Jail's control center. (Malugen's Dep. at 16, ECF No. 46-3.) The small window in the door of the LHT is "very tinted." (Id. at 19.) LHT does not have a camera

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]"Def." refers to Washington County.

[3]"Stat." refers to a party's statement of uncontroverted material facts that is either admitted by the opposing party for purposes of the motion for summary judgment or supported by the record.

inside the cell; rather, it "is covered from cameras . . . in the booking area."[4] (Skiles' Dep. at 45, ECF 46-4.) A corrections officer should always be in the booking area. (Malugen Dep. at 15.)

Unlike the LHT, the three "tanks" in the Jail have cameras in them. (Skiles Dep. at 40, 45.) Each tank includes a cell on either side of a day area with a television and picnic table. (Id. at 40, 41.) Each cell has two fixed bunk beds and can accommodate four inmates. (Id. at 41.) The cell doors may be opened to allow the inmates to move about in the day area, but the door to the tank is locked and an inmate cannot leave the tank unless permitted. (Id.) If necessary, a ninth inmate may be accommodated by placing two mattresses in the day area. (Id. at 42.) Two of the tanks house men; one houses women. (Id. at 42-43.) It is the written policy of the Jail that female inmates are to be isolated from male inmates. (Def.'s Ex. F-1, ECF No. 41-8 at 6.)

In 2010, the average daily female population of the Jail was seven. (Def.'s Ex. J, ECF No. 41-14.) There were seventy-five females admitted between April 13, 2010, and June 23, 2010. (Def.'s Ex. K, ECF No. 41-15.) There were nine females confined on June 23, 2010, and an average daily population of seven during the relevant two-month period. (Id.)

How a police officer comes into the Jail depends on his point of entry. (Malugen Dep. at 21.) If he comes in from the lobby or the sally port, he has to be buzzed in by a corrections officer. (Id.) If he comes in from the upstairs, he can come in through the door if he has the access code. (Id. at 21-22.) Ms. Malugen, the Jail Administrator, testified in

---

[4]Malugen refers to "the booking or the control center." (Malugen Dep. at 16.)

her deposition a police officer is not permitted in any of the holding cells or tanks.  (Id. at 23.)  Instead, it is the responsibility of one of the two corrections officers on duty to get the person the police officer needs to see.  (Id.; Skiles Dep. at 72.)  Each corrections officer has a set of keys to all the locks.  (Skiles' Dep. at 74.)  There is not a set of key that is not kept on a corrections officer.  (Id.)  Every one that comes in and out of the Jail is to be listed on a jail activity log.  (Id. at 36.)  This duty is included in corrections officers' training, but is not part of the written policy of the Jail.  (Id.)  An inmate activity report should list, among other things, an inmate's cell assignments.  (Id. at 100.)  Such information might also be added to a notes portion of the computer record for each inmate.  (Id. at 95.)

Defendant John Doe had, at all relevant times, the code to enter the Jail from the upstairs door.  (Doe Dep. at 99-100, ECF No. 46-5.)  On April 8, 2010, Plaintiff was being held at the Jail on a 24-hour hold.  (Pl.'s Stat. ¶¶ 5, 40.)  On that day, Doe removed her from the Jail and took her to an office in the Sheriff's Department, housed in the same building, to question her.  (Id. ¶ 40.)  At the time, he was an employee of the St. Francois County Sheriff's Office on assignment with the Mineral Area Drug Task Force.[5]  (Doe Dep. at 12, 23, ECF No. 41-6.)  When removing Plaintiff from the Jail, Doe was not required to complete any paperwork or make any entry in a log to record that he had done so.  (Doe Dep. at 102, 103, ECF No. 46-5.)  He testified in his deposition that he believed the correction officers were to record his entry and exit.  (Id. at 100.)  Sheriff Skiles testified in his deposition that Doe's removal of Plaintiff from the jail should have been, but was not,

_____

[5]Doe has since been hired by Washington County as a lieutenant.  (Pl.'s Stat. ¶ 30.)

recorded by the correction officer in the jail log for that day. (Skiles Dep. at 72-73.) The omission was a deviation from policy. (Id. at 73; Malugen Dep. at 76.)

On June 18, 2010, when Plaintiff was confined as a pretrial detainee in the Jail, she was given a pregnancy test. (Skiles Dep. at 102.) The test should have been, but was not, recorded by a corrections officer in the jail log for that day. (Id. at 94, 102, 103.) The test was positive. (Id. at 53.) Plaintiff was impregnated while confined in the Jail. (Pl.'s Stat. ¶ 3.) She testified in her deposition that when confined in the LHT, she was grabbed by Doe and thrown to the ground. (Roe Dep. at 51, ECF No. 46-2.) Doe then choked her. (Id. at 53.) She lost consciousness. (Id.) When she woke up, she was on the floor and alone in the LHT. (Id. at 54.) Her pants were twisted, her vagina was sore, and there was a liquid that looked like semen on her. (Id. at 55-56.) Plaintiff further testified that it was not possible that she was impregnated by anyone other than Doe. (Id. at 180.) Skiles testified that it was not possible that Plaintiff was impregnated by another inmate. (Skiles Dep. at 51, 64.)

Plaintiff terminated her pregnancy, and did not preserve any tissue or similar substance. (Roe Dep. at 179.)[6]

When a pretrial detainee in the Jail, Plaintiff never complained about the lack of a camera in the LHT or of it being too secluded, nor is she aware of anyone else making such a complaint. (Id. at 166-67.) She does not know of anyone else having been raped when in the Jail. (Id. at 167.) She also never complained about the Jail being overcrowded; at best, she told other inmates something to the effect that it was "really crowded in here." (Id. at

---

[6]Additional factual allegations are set forth below as relevant.

160-61.) She does not remember anyone telling her there was an overcrowding problem. (Id. at 161.)

Plaintiff alleges in her complaint that, in violation of 42 U.S.C. § 1983, Washington County violated her constitutional rights by being deliberately indifferent to her safety and security. Specifically, despite being aware that its facility was dangerously overcrowded, that its security measures were inadequate, and that its training of staff and corrections officers was inadequate, Washington County (a) failed to provide adequate space to house the inmates in its Jail; (b) failed to adequately monitor the areas where detainees are housed; and (c) allowed Doe to enter the Jail and move about unmonitored. In her deposition, Plaintiff explained that she held Washington County accountable because they were not "supervising very well." (Id. at 180.) In a second § 1983 count, Plaintiff alleges that Washington County is liable under a theory of respondeat superior for Doe's injurious actions. Plaintiff further alleges that the LHT and the Jail are dangerous conditions of which Washington County had actual or constructive notice. These dangerous conditions caused her injuries, for which Washington County is liable under state law. Asked in her deposition to identify the dangerous conditions of the LHT, Plaintiff relied the floor was always wet and smelt bad. (Id. at 166.)

Washington County moves for summary judgment, arguing that (1) Plaintiff has failed to establish a genuine issue of material fact as to whether it acted in deliberate indifference to her safety; (2) there is no respondeat superior liability under § 1983; and (3) it has not waived sovereign immunity from the tort described in the third count against it.

**Discussion**

Summary Judgment Standard.  Rule 56(a) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **MidAmerican Pension and Emp. Benefits Plans Admin. Comm. v. Cox**, 720 F.3d 715, 718 (8th Cir. 2013); see also **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986) (discussing prior Rule 56(c), the predecessor to Rule 56(a) of the Federal Rules of Civil Procedure). "The movant 'bears the initial responsibility of informing the . . . [C]ourt of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" **Torgerson v. City of Rochester**, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Celotex Corp., 477 U.S. at 323) (last two alterations in original).  "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing a genuine issue for trial.'" **Id.** (quoting Celotex Corp., 477 U.S. at 324).  The existence of a factual dispute is not enough alone to avoid entry of summary judgment; "rather, the dispute must be outcome determinative under the applicable law." **Hammer v. City of Osage Beach, MO**, 318 F.3d 832, 837 (8th Cir. 2003). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" **Torgerson**, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000)).

Section 1983 Claims.  Plaintiff argues that she has presented a submissible case against Washington County of liability based on its "custom and practice of deliberate

indifference to the welfare of female inmates" and its "failure to train its officers to follow essential safety protocols."  (Pl.'s Br. at 2, ECF No. 46.)  Washington County contends that Plaintiff has submitted no evidence of either.

Title 42 U.S.C. § 1983 "provides a cause of action to any person deprived of a federal right by someone acting under color of state law."  **Ellis v. Houston**, — F.3d — , 2014 WL 349765, *8 (8th Cir. Feb. 3, 2014).  Accord **Alexander v. Hedback**, 718 F.3d 762, 765 (8th Cir. 2013) ("To state a claim under 42 U.S.C. § 1983, a plaintiff must show that [s]he was deprived of a right secured by the Constitution and the laws of the United States and that the deprivation was committed by a person acting under color of state law.").  A pretrial detainee has a right under the Fourteenth Amendment's Due Process Clause to be protected from violence while confined.  See **Kahle v. Leonard**, 477 F.3d 544, 550 (8th Cir. 2007); **Perkins v. Grimes**, 161 F.3d 1127, 1129 (8th Cir. 1998) (per curiam).  This is "at least as great protection as that afforded convicted prisoners under the Eighth Amendment."  **Stickley v. Byrd**, 703 F.3d 421, 423 (8th Cir. 2013) (internal quotations omitted).  "Nevertheless, not every injury suffered by one . . . detainee at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety."  **Perkins**, 161 F.3d at 1130 (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

"'[L]ocal governments[, e.g., Washington County,] . . . may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'"  **Johnson**

**v. Douglas Cnty. Med. Dep't**, 725 F.3d 825, 828 (8th Cir. 2013) (quoting <u>Monell v. Dep't</u>

<u>of Soc. Servs.</u>, 436 U.S. 658, 690-91 (1978)) (third alteration in original).

> "To establish a claim for 'custom' liability, [Plaintiff] must demonstrate:
>
> 1)   The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2)  Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3)  That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation."

<u>Id.</u>  "With respect to the first element, 'a single deviation from a written, official policy does

not prove a conflicting custom.'"  **Id.** (quoting <u>Wedemeier v. City of Ballwin, Mo.</u>, 931 F.2d

24, 26 (8th Cir. 1991)).  However, "an act performed pursuant to a 'custom' that has not been

formally approved by an appropriate decisionmaker may fairly subject a municipality to

liability on the theory that the relevant practice is so widespread as to have the force of law."

**Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown**, 520 U.S. 397, 404 (1997).  With

respect to the third element, "[t]here must be a causal connection between the municipality's

. . . custom and the alleged constitutional deprivation[.]"  **Ulrich v. Pope Cnty.**, 715 F.3d

1054, 1061 (8th Cir. 2013).  <u>See</u> <u>also</u> **Brown**, 520 U.S. at 404 ("[A] plaintiff must show that

the municipal action was taken with the requisite degree of culpability and must demonstrate

a direct causal link between the municipal action and the deprivation of federal rights.").

Plaintiff argues that overcrowding in the Jail reflects a custom of Washington County

to fail to implement and adhere to policies governing the safe housing of inmates, as

evidenced by her placement in an inadequately monitored cell, the LHT. Had she not been placed in this cell, with its very dark window, she would not have been raped by Doe. Washington County counters that there was no overcrowding and, regardless, Plaintiff's placement in the LHT was for reasons unrelated to the number of inmates being housed.

Overcrowding alone does not describe a constitutional violation. See **Patchette v. Nix**, 952 F.2d 158, 163 (8th Cir. 1991). Overcrowding that leads to increased danger, however, may describe a constitutional violation. See **Doe By and Through Doe v. Washington Cnty.**, 150 F.3d 920, 923 (8th Cir. 1998) (holding that jury could find that county violated juvenile detainee's right to be safe when overcrowded conditions led to him being returned to cell with attackers); **Redman v. Cnty. of San Diego**, 942 F.2d 1435, 1447 (9th Cir. 1991) (en banc) (holding that a jury could find that the sheriff in charge of a detention facility was deliberately indifferent to a pretrial detainee's safety when allowing overcrowding at facility, such overcrowding being "a moving force" behind the detainee's rape).

In the instant case, however, there is no evidence of overcrowding. Plaintiff cites an average daily inmate population from January 1, 2010, to June 23, 2010, of 47 inmates, or 168 percent of capacity, and on June 23, 2010, the day Plaintiff was released on bond, of 58 inmates, or 207 percent of capacity. Male and female inmates were housed in separate tanks. During this period, the average daily female inmate population was seven. On June 23, 2010, there were nine females. The undisputed testimony is that each tank normally accommodates eight inmates, and a ninth may be accommodated by placing mattresses in the day area.

When asked in her deposition how many women were housed in the tank, Plaintiff replied, "A lot." (Roe Dep. at 163.) She did not know a number. (Id.) When asked why she was placed in the LHT, Plaintiff replied, "Overcrowding sometimes." (Id.) Asked if that was her assumption or if someone had told her overcrowding was the reason, she replied, "Well." (Id.) She testified she was never given an explanation by Washington County for her placement in the LHT. (Id.) Malugen testified in her deposition that Plaintiff was placed in the LHT only after it was learned she was pregnant, and that was so she could be monitored. (Malugen Dep. at 36.) Skiles testified in his deposition Plaintiff was moved because issues had arisen requiring that "female inmates needed to be segregated from each other because they were associates on a different case." (Skiles Dep. at 56.) This inconsistency in the two proffered reasons for Plaintiff being housed in the LHT is insufficient to establish a genuine issue of material fact whether she was housed there because of overcrowding. And, Plaintiff has offered no evidence that is not "mere speculation or conjecture" in support of her argument to the contrary. See **Bayside Holdings, Ltd. v. Viracon, Inc.**, 709 F.3d 1225, 1228 (8th Cir. 2013) (holding that either is insufficient to counter a properly-supported motion for summary judgment).

Additionally, even were overcrowding to be the reason for Plaintiff's placement in the LHT, there is no evidence of a causal connection between the overcrowding and the rape. See **Ulrich**, 715 F.3d at 1061 (requiring such a connection). See also **Doe v. Sullivan Cnty., Tenn.**, 956 F.2d 545, 550 (6th Cir. 1992) (finding no causal relationship between injuries and overcrowding and requiring more than the plaintiff's "naked assertion that the assault would not have occurred but for the [overcrowding]"). Plaintiff testified she was raped by

Doe when she was in the LHT. She argues that the lack of video surveillance made the LHT particularly vulnerable and that Doe could move about unmonitored. Skiles testified, however, that Doe could not have gotten the keys to the LHT. Malugen testified that a police officer is not allowed to enter a holding cell or tank. Plaintiff counters that Doe was able before to remove her from the Jail without it being noted or recorded. Plaintiff fails, however, to show that Doe's ability to remove her from the Jail and take her to another portion of the building for questioning when she was confined on a twenty-four hold is indicative of a condition created by overcrowding which allowed Doe, or any other law enforcement officer from another jurisdiction, to enter alone a locked cell at the Jail.[7] See **Crow v. Montgomery**, 403 F.3d 598, 602-03 (8th Cir. 2005) (reversing denial of summary judgment to officials of detention center on claim that center was unreasonably dangerous due to chronic overcrowding and led to his injuries by fellow inmates; plaintiff "allege[d], at most, institution-wide deficiencies" and "supervisory jail officials were not liable for acts that may or may not have contributed" to plaintiff's injuries); **Kolota v. Sevier Cnty., Tenn.**, 470 Fed.Appx. 487, 488 (6th Cir. 2012) (holding that summary judgment was properly granted to county on claim that overcrowding resulted in housing misclassification and contributed to rape; although rape was "unimaginably tragic," plaintiff failed to show that overcrowding and misclassification were moving force that caused the rape).

---

[7]The Court also notes that the undisputed evidence is that cameras in the booking area covered the door to the LHT. Whereas cameras inside the tanks where more than one inmate was housed are reasonably necessary to surveil inmate interactions, Plaintiff has failed to proffer any similar security for the LHT that is not addressed by the outside cameras. According to Jail policy, Doe should not have entered the LHT. Thus, the outside camera would have caught the transgression.

In addition to failing to show that Washington County had a custom of overcrowding that caused her rape, Plaintiff has failed to identify a policy of Washington County that caused it. For purposes of municipal liability under § 1983, "a 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." **Mettler v. Whitledge**, 165 F.3d 1197, 1204 (8th Cir. 1999). Plaintiff emphasizes the lack of a written training procedures defining the recording of cell assignments and movements of non-Washington County law enforcement officers in arguing there was deliberate indifference to her safety. The lack of a written policy giving "detailed guidance that might have averted a constitutional violation by an employee" gives rise to municipal liability "only where [the municipality's] inaction reflects a deliberate indifference to the constitutional rights of the citizenry, such that inadequate training or supervision actually represents the [municipality's] 'policy.'" **Szabla v. City of Brooklyn Park, Minn.**, 486 F.3d 385, 392 (8th Cir. 2007). Plaintiff has failed to show that the verbal policy was so inadequate as to reflect a deliberate indifference to the Jail's detainees' safety.

Plaintiff further argues that the Jail had a custom or policy of not recording all the activities involving inmates and that this created a significant risk to the inmates of sexual assault. In support, she cites the April 8 occasion when Doe removed her from the jail. She also cites other activity that should have been recorded was not. For instance, not all lawyer visits were recorded in the log, her pregnancy test was not recorded, and her cell assignments were not recorded in the inmate activity list. (Malugen Dep. at 49-50, 57; Skiles Dep. at 98.)

"[M]ultiple incidents involving a single plaintiff could establish a 'custom' if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials." **Johnson**, 725 F.3d at 829.  The incidents cited by Plaintiff were all unknown to the two officials involved, the Sheriff and the Jail Administrator, and were against Jail policy.  Moreover, there is nothing before the Court to suggest that the one-time unrecorded removal of Plaintiff from the Jail by Doe, the unrecorded cell assignments of Plaintiff during an eleven-week period, and the unrecorded pregnancy test were sufficient to permit notice to either official of a practice of not recording inmate movements sufficient to create a risk of sexual assault.  Nor does what Plaintiff describe as "easy" or "unfettered" access to the Jail by Doe and other law enforcement officers, see Plaintiff's Brief at 7, establish the existence of a custom that created a risk inmates would be sexually assaulted by an officer.  The evidence is that Doe and other law enforcement officers have access to the booking area, not to the tanks or holding cells in which the inmates are confined.  The only evidence of Doe having access to a holding cell or tank is the incident at issue.[8]

"Generally, an isolated incident of alleged police misconduct, such as [Plaintiff] alleges occurred here, cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983." **Ulrich** 715 F.3d at 1061 (holding there can be no municipal liability

---

[8]Plaintiff contends in her brief that there is "extensive evidence of unrecorded and unmonitored entries by officers into the cells and rooms of female inmates" and "extensive evidence of unrecorded and unmonitored movements of inmates within the jail," all contrary to jail policy.  (Pl.'s Brief at 9.)  There is no evidence before the Court of the latter and the only evidence of the former is the incident at issue.

when only example of inadequate supervision and training was the acts, i.e., the plaintiff's arrest and detention, at issue).

Plaintiff contends that Doe's access to her holding cell is similar to the access and subsequent sexual assault found in **<u>Kahle</u>**, supra, to present a jury question in   It is not.  At issue in that case were allegations that a deputy sheriff had been deliberately indifferent to a serious risk that the plaintiff, a pretrial detainee, would be sexually assaulted by a corrections officer.  The deputy sheriff was the officer's supervisor the night in question and was to closely observe him and "ensure [the officer] did not act improperly."  477 F.3d at 547.  While the deputy sheriff was at a work station, the officer entered the plaintiff's cell three times in a one-hour period after lockdown, assaulting her each time.  **<u>Id.</u>** at 548.  The jail policy required that any time a cell door was opened after lockdown, the event had to be noted on the shift lob.  **<u>Id.</u>**  The deputy sheriff was responsible for ensuring that the log was accurate.  **<u>Id.</u>**  None of the officer's three visits were recorded.  **<u>Id.</u>** at 549.  There was evidence that the officer told the deputy sheriff each time he went to the plaintiff's cell; indeed, the second time he showed the deputy sheriff drawings he had taken from the plaintiff and told the deputy sheriff he was going to trace one and return them to the plaintiff. **<u>Id.</u>** at 548.  There was also evidence that a light on a panel at the work station changed from green to red when a cell door was unlocked and remained red until the door was locked again.  **<u>Id.</u>**  And, there was evidence that the deputy sheriff could see into the plaintiff's cell and would have seen the officer kiss her.  **<u>Id.</u>**  The court held a jury could find from these facts that the deputy sheriff "was aware of a substantial risk of serious harm to [the plaintiff] and exhibited deliberate indifference to that risk."  **<u>Id.</u>** at 552.

In the instant case, however, the question is whether a jury could find that Washington County was aware of a substantial risk of serious harm to Plaintiff based on a law enforcement officer's ability to remove her once from the Jail when she was on a twenty-four hour hold. There is no evidence that the officer, Doe, had prior complaints against him for sexual assault[9]; that Washington County knew of any complaints at all of failure to protect inmates or of inmates being sexually assaulted; that Washington County knew, or had reason to know, that law enforcement officers from other jurisdictions were entering inmates' locked cells; and that movements of inmates were not being properly recorded. Indeed, there is no evidence that there were prior sexual assaults or that, apart from Plaintiff's allegations, law enforcement officers were entering inmates' locked cells. In **Mettler**, supra, the court found that two prior complaints of excessive force against one of two officers who had shot plaintiff's son and seven complaints of excessive or unnecessary force against the other officer[10] were insufficient to show "a municipal custom of permitting or encouraging excessive force." 165 F.3d at 1205. See also **Andrews v. Fowler**, 98 F.3d 1069, 1076 (8th Cir. 1996) (finding no evidence of a municipality's "persistent and widespread pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct" when municipality had two prior complaints of officer's improper behavior toward females he

---

[9]Doe testified in his deposition that there were no citizen complaints against him when he was working for the Task Force. (Doe Dep. at 43.) When employed as a police officer by another municipality, there was an excessive force complaint that he hit an arrestee in the knee with his mag light; this complaint was determined after investigation to be fictitious. (Id. at 20-21.)

[10]The court noted that only one of the nine complaints were sustained after a departmental investigation and that the one had only been sustained in part. 165 F.3d at 1205.

encountered in the course of his duties but had never received complaints of violence or sexual assault by officer).  Cf. **Parrish v. Luckie**, 963 F.3d 201, 205 (8th Cir. 1992) (holding jury could properly have found police chief was deliberately indifferent to citizens' safety when he implemented system wherein reports of physical or sexual assault by his police "discouraged, ignored, or covered up").

Plaintiff further argues that a failure of Washington County to adequately train its employees to record all activities involving the Jail's inmates reflects a deliberate indifference to the inmates' safety.  "'"Deliberate indifference" entails a level of culpability equal to the criminal law of recklessness.'"  **B.A.B., Jr. v. Bd. of Educ. of City of St. Louis**, 698 F.3d 1037, 1040 (8th Cir. 2012) (quoting Bender v. Regier, 385 F.3d 1133, 1137 (8th Cir. 2004)).  In other words, a jail official "'must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'"  **Bender**, 698 F.3d at 1040 (quoting Farmer, 511 U.S. at 837).  A failure to train may amount to deliberate indifference.  **Folkerts v. City of Waverly, Iowa**, 707 F.3d 975, 982 (8th Cir. 2013).

Skiles testified the Jail's corrections officers are told as part of their field training that "every activity, every movement, every inmate" is to be logged.  (Skiles Dep. at 36.)  It is not a written policy, but is a verbal policy.  (Id.)  As evidence that this training is not followed, Plaintiff again cites the April 8 occasion when Doe removed her from the jail and the absence from the log or inmate activity list of a record of all her lawyer visits, of her pregnancy test, and of her cell assignments.  In **Luckert v. Dodge Cnty.**, 684 F.3d 808, 819 (8th Cir. 2012), the Court held that a "[f]ailure to follow written procedures does not

constitute *per se* deliberate indifference," reasoning that "such a rule would create an incentive for jails to keep their policies vague, or not formalize policies at all." This reasoning applies with equal force to the Jail's undisputed verbal policies. Moreover, although "notice of a pattern of unconstitutional behavior need not be shown where the failure to train employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious," **Larson by Larson v. Miller**, 76 F.3d 1446, 1454 (8th Cir. 1996), there is no evidence that Washington County, Skiles, or Malugen knew of Doe's earlier visit or of any gaps in Plaintiff's inmate activity list before she was sexually assaulted. Thus, the need for further training was not obvious. See **Szabla v. City of Brooklyn Park, Minn.**, 486 F.3d 385, 392-94 (8th Cir. 2007) (finding that a one-time incident in which a police officer commanded a dog to bite a suspect without advance warning did not, absent evidence of a pattern of constitutional violations, support a claim the city acted with deliberate indifference in failing to adequately train its officers on the use of dogs).

"It may be . . . that 'evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.'" **Folkerts**, 707 F.3d at 982 (quoting Brown, 520 U.S. at 409). Assuming, without deciding, that the cited lapses are the result of inadequate or unreinforced training, Plaintiff has failed to establish a genuine issue as to whether those lapses presented a clear potential of sexual assault by a law enforcement officer. See **Tilson v. Forrest City Police Dep't**, 28 F.3d 802, 807 (8th Cir. 1994) (holding any laxness or inaction of government must be moving force behind constitutional violation). There is no evidence that Washington County, Skiles, or

Malugen "'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'" **Andrews**, 98 F.3d at 1076 (quoting Thelma D. by Delores A. v. Bd. of Educ. of St. Louis, 934 F.2d 929, 934 (8th Cir. 1991)).  Additionally, an "identified deficiency in a [municipality's] training program must be closely related to the ultimate injury." **City of Canton, Ohio v. Harris**, 489 U.S. 378, 391 (1989); accord **Andrews**, 98 F.3d at 1077 (holding that plaintiff alleging she was raped by police officer could not demonstrate that municipality's failure to train that officer caused him to rape her; indeed, claims of failure to train did not "even raise[] a question of fact as to causation").  One incident – her removal from the Jail – occurred when Plaintiff was confined on a twenty-four hour hold.  Any connection between the incidents involving her movements not being recorded by correction officers and her rape by a non-Washington County law enforcement officer in a locked holding cell is mere speculation.

Additionally, insofar as Plaintiff appears to argue that the lapses in recording were purposely unique to her, this argument is unavailing.  During his deposition, Skiles was questioned about an inmate activity list for Plaintiff.  (Skiles Dep. at 97.)  He replied "No" in response to the question whether there was "a benign explanation for why there would not be an inmate activity list for [Plaintiff]." (Id.)  "Benign" is "[o]f a kind disposition, gracious, kindly" or "[e]xhibiting or manifesting kindly feeling in look, gesture, or action; bland, g e n t l e ,    m i l d ."    O x f o r d   E n g l i s h   D i c t i o n a r y , http://www.oed.com/view/Entry/17733?redirectedFrom=benign (last visited Feb. 12, 2014). The absence of a benign explanation does not equate with deliberate indifference to Plaintiff's safety.  The failure of correction officers to follow their training could be non-

benign. Moreover, after being asked about no inmate activity list for Plaintiff, Skiles was then shown an exhibit identified as an inmate activity list for Plaintiff and questioned about the paucity of entries on the list for cell assignments. (Skiles Dep. at 97-98.) Skiles' answers to the question about Plaintiff's inmate activity list does not establish the necessary connection between any omissions in that list and her rape.

In further support of her position that she has made a submissible case, Plaintiff argues that a jury could find that the lack of investigation into her rape and of remedial measures taken afterwards are manifestations of Washington County's prior practices evidencing a deliberate indifference to inmates' safety. (Pl.'s Brief at 12.)

Skiles testified in his deposition that he was told by Malugen that there was a rumor that Plaintiff was pregnant and had become so while confined. (Skiles Dep. at 51-53.) He heard this for the first time while Plaintiff was confined. (Id. at 51-52.) He instructed Malugen to speak with Plaintiff to determine the validity of the rumor. (Id. at 51-52, 53.) It was later reported to him that Plaintiff did not want to file a complaint. (Id. at 52.) Malugen informed him that Plaintiff had told her that she was not impregnated when in the Jail. (Id. at 54.) There was no further investigation. (Id.) Malugen testified in her deposition that an investigation would be warranted if Plaintiff did become pregnant when in the Jail. (Malugen Dep. at 86.)

Skiles first learned of Plaintiff's allegations that she had been raped by Doe from a newspaper reporter. (Skiles at 59.) He did not then conduct any investigation because no formal complaint had been filed. (Id. at 59, 119.) He was told by Malugen that she had

checked the camera footage of the door to the LHT[11] and did not see anything supporting Plaintiff's allegations.  (<u>Id.</u> at 64.)

Skiles also testified that he and Doe are friends, and he has known Doe for a long time.  (<u>Id.</u> at 87-88.)  Doe had been commissioned by Washington County as a law enforcement officer at the time this action was filed.  (<u>Id.</u> at 118.)  His employment status has not been affected by Plaintiff's allegations.  (<u>Id.</u>)  Doe testified in his deposition that he has never been questioned by anyone about Plaintiff's allegations.  (Doe Dep. at 118.)  Nor has he heard of any investigation into her allegations.  (<u>Id.</u> at 118, 128)  When asked if he had ever been questioned by Skiles about the allegations, Doe replied that "he knows me better than that, so there was no conversation."  (<u>Id.</u> at 128.)

Although "[e]vidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to [sexually assault inmates] without concern or punishment," **<u>Mettler</u>**, 165 F.3d at 1205, there is no such evidence in the instant case.  Instead, Plaintiff focuses on the lack of an investigation into her sexual assault by Doe.  Shortcomings in an investigation, or the lack of one, into the sexual assault of Plaintiff "would not prove the flawed investigation was a moving force behind [Doe's] alleged misconduct."  **<u>Id.</u>** (affirming grant to county of summary judgment when plaintiff had offered no evidence that any previous investigations were inadequate or that such investigations were moving force behind officers' actions toward son).  <u>See</u> <u>also</u> **<u>Luckert</u>**,

---

[11]The camera footage is automatically recorded over after a certain period of time.  (<u>Id.</u> at 46.)

684 F.3d at 820 (finding county entitled to judgment as a matter of law when some of deficiencies which allegedly led to plaintiff's son's suicide when a pretrial detainee occurred after suicide and, consequently, "were not probative to the issue at hand").

Whatever deficiencies existed in Washington County's procedures regarding movement and monitoring within its Jail of inmates and of law enforcement officers from other jurisdictions, Plaintiff has failed to show that those deficiencies reflect a deliberate indifference to her safety and were the moving force behind her assault.

Respondeat Superior.  In her Count III of her complaint and in her response to the motion for summary judgment, Plaintiff requests this Court change existing law that § 1983 claims may not be based on respondeat superior or vicarious liability.  See **Monell**, 436 U.S. at 690-91.  This is a well established rule.  **Johnson**, 725 F.3d at 828.  It is also well established that it is not for this Court to overrule a Supreme Court decision.  "[Unless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." **Hutto v. Davis**, 454 U.S. 370, 375 (1982) (per curiam).

Dangerous Condition.  In her third count against Washington County, Plaintiff seeks to hold it liable for housing her in "a rest room that was dangerously secluded, unmonitored, unsafe, and ill-equipped for human habitation and safety, and within a jail that was dangerously small, overcrowded, unsafe, and ill-equipped for human habitation and safety." (Compl. ¶ 42; ECF No. 7.)  She further alleges that "[t]hese dangerous conditions created a reasonably foreseeable risk of harm to [her]."  (Id. ¶ 43.)

Washington County is entitled to sovereign immunity from Plaintiff's tort claims unless the statutory exception for dangerous conditions applies. See **Davis v. Oregon Cnty., Mo.**, 607 F.3d 543, 552, 553 (8th Cir. 2010) (citing Mo.Rev.Stat. § 537.600.1). That exception provides for the waiver of sovereign immunity in cases of "[i]njuries caused by the condition of a public entity's property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that either a negligent or wrongful act or omission of an employee of the public entity . . . created the dangerous condition . . . ." Mo.Rev.Stat. § 537.600.1(2). "In determining whether sovereign immunity is waived, the statute is to be strictly construed." **Fosket v. City of Dixon**, 398 S.W.3d 571, 574 (Mo.Ct.App. 2013). "The proof elements of the exception require [Plaintiff] to identify specifically the dangerous condition on which . . . she is relying to recover and the causal connection to . . . her claimed injuries." **Id.**

In her deposition, Plaintiff identified the wet, smelly floor of the LHT as the dangerous condition. In her response to the motion for summary judgment, she identified overcrowding and inadequate security protections as the dangerous conditions. The first identification fails because there is no causal connection; the second fails because they are not dangerous conditions under § 537.600.1(2).

"The question of whether the dangerous condition was the direct cause of the accident is the same as whether it was the proximate cause." **Smith v. Mo. Highways and Transp. Com'n**, 372 S.W.3d 90, 95 (Mo.Ct.App. 2012). There is proximate cause if the injury at

issue "is the natural and probable consequence" of the dangerous condition. **Id.** There is no allegation that a wet floor made Plaintiff more vulnerable to the sexual assault.

"The dangerous condition alleged 'must describe, define, explain, denote or reference only and exclusively the *physical defects* in, upon and/or attending to property of the public entity.'" **Rodgers v. City of North Kansas City**, 340 S.W.3d 154, 158 (Mo.Ct.App. 2011) (quoting State ex rel. Div. of Motor Carrier & R.R. Safety v. Russell, 91 S.W.3d 612, 616 (Mo. 2002) (en banc)) (emphasis added). "[D]efects in the physical condition and physical deficiencies created by the placement of objects on public property" may be included in the phrase "dangerous conditions." **Id.** (internal quotations omitted). On the other hand, "[f]ailure to perform an intangible act" is not a "dangerous condition." **Russell**, 91 S.W.3d at 616; accord **Boever v. Special School Dist. of St. Louis Cnty.**, 296 S.W.3d 487, 494 (Mo.Ct.App. 2009). Plaintiff's complained-of deficiencies are all of intangible acts. They do not describe a "dangerous condition" for purposes of § 537.600.1(2). See e.g. **Rodgers**, 340 S.W.3d at 158-59 (rejecting plaintiff's claim that allowing nurse to have access to sedative medications and to be alone with female patients in room with a lock made it easier for him to sexually assault patients and, therefore, such access to medications and locked room was a dangerous condition as defined in § 537.600.1); **Conway v. St. Louis Cnty.**, 254 S.W.3d 159, 168 (Mo.Ct.App. 2008) (mother's claim against city and its law enforcement officers for failure to supervise arising from officers fatally shooting son when responding to call of threatened suicide did not describe dangerous condition under § 537.600.1).

## Conclusion

For the reasons set forth above, Plaintiff has failed to establish a genuine issue of material fact whether Washington County is liable under § 1983 or state law for the alleged rape. Accordingly,

**IT IS HEREBY ORDERED** that the motion of Washington County, Missouri, for summary judgment is **GRANTED**. [Doc. 40] Plaintiff's claims against Washington County, Missouri, are DISMISSED.

**IT IS FURTHER ORDERED** that a final pretrial conference shall be held in chambers on **Thursday, April 3, 2014**, at **9:30 a.m.** Counsel should be prepared to be trained on the courtroom electronic evidence presentation technology immediately following the conference.

An Order of Partial Dismissal shall accompany this Memorandum and Order.

/s/Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  26th  day of February, 2014.